## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BATTALION RESOURCES, LLC | ) | Case No. 16-18917 TBM |
| EIN:  27-4944324, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| In re: | ) | |
| | ) | |
| STORM CAT ENERGY (USA) OPERATING CO. | ) | Case No. 16-18920 TBM |
| EIN:  20-2561097, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| In re: | ) | |
| | ) | |
| STORM CAT ENERGY (POWDER RIVER), LLC | ) | Case No. 16-18922 TBM |
| EIN:  20-2561157, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| In re: | ) | |
| | ) | |
| STORM CAT ENERGY ACQUISITIONS, LLC | ) | Case No. 16-18925 TBM |
| EIN:  45-3126793, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | **Jointly Administered Under** |
| | ) | **Case No. 16-18917 TBM** |

---

### DEBTORS' MOTION FOR ENTRY OF
### (I) AN ORDER (A) APPROVING BIDDING PROCEDURES
### AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF
### SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING
### THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN
### AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE
### ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (E) GRANTING
### RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE ASSET PURCHASE
### AGREEMENT BETWEEN THE DEBTORS AND THE PURCHASER, AND
### (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
### ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
### INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
### CONTRACTS, AND (D) GRANTING RELATED RELIEF

---

Battalion Resources, LLC, and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully state the following in support of this motion:

## I. Jurisdiction and Venue

1.       The United States Bankruptcy Court for the District of Colorado (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and D.C. COLO. LCivR 84.1(a) of the United States District Court for the District of Colorado. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, insofar as the Court's General Procedure Order Number 2016-01 applies, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9013-1 of the Court's Local Bankruptcy Rules, Forms and Appendix (the "Local Rules").

## II. Background

4.       The Debtors are an affiliated onshore oil and gas exploration and production company with headquarters in Denver, Colorado, and operations primarily located in Wyoming. The Debtors operate, or have royalty or working interests in, approximately 2,290 oil and gas production sites.  None of these wells are currently producing hydrocarbons; they have been

2

shut-in since at least July 2015. Regulatory authorities in the State of Wyoming have demanded that all of the wells be plugged and abandoned by the Debtors.

5.     On September 8, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 13, 2016, the Court entered an order authorizing procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 20]. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. To date, no official committee of unsecured creditors has been appointed in these chapter 11 cases.

6.     Having explored other alternatives, the Debtors determined that a sale of substantially all of their assets would maximize the value of their estates for all stakeholders. Pursuant to the Debtors' pending Motion to Use Cash Collateral [Docket Nos. 14 and 16] (the "Cash Collateral Motion"), the Debtors are required to expeditiously move toward a number of sale milestones. The sale milestones are structured to allow for the Debtors' sale of substantially all of their assets to be closed within approximately three months of the start of these cases.

7.     After having lined up a separate purchase and sale agreement in principle, which fell through in early October 2015, Debtors embarked on an effort to market their assets to interested alternative buyers. Operational issues with the wells and Debtors' constrained cash situation made it impractical to hire a marketing company to shepherd this process. Due to the relative low value of the wells net of large asset retirement liabilities, and the current non-operational status of the wells, efforts were made to select potential buyers with prior coalbed methane experience in the area and a willingness and ability to deal with these significant

DOCS-#5454658-v1
DOCS-#5454658-V3

operational concerns.  A virtual data room was set up and since October 2015, approximately 40 potential buyers were contacted.  Approximately 20 potential buyers were granted access to and have reviewed due diligence information in the data room.  Significant effort was expended in assisting interested parties in follow-up conversations, and additional due diligence and analysis.

8.      The Debtors' marketing efforts have now paid off.  Specifically, the Debtors and Powder River Holdings, LLC (the "Stalking Horse Bidder"), have entered into an Asset Purchase Agreement, dated as of September 7, 2016 (including all exhibits and schedules related thereto, the "Stalking Horse Purchase Agreement"), whereby the Stalking Horse Bidder proposes to purchase substantially all of the Debtors' assets for cash consideration of $1.00 and the assumption of specified liabilities and obligations of the Debtors, including environmental obligations estimated to be at least $14 million and possibly as much as $35 million (the "Purchase Price").

9.      The Debtors now seek authority to market-test the transactions contemplated by the Stalking Horse Purchase Agreement (collectively, the "Stalking Horse Bid") to ensure that they obtain the highest or otherwise best offer or combination of offers for the Debtors' assets. As set forth in further detail below, the sale, the Stalking Horse Purchase Agreement, the proposed bidding procedures (the "Bidding Procedures"), and the related relief requested in this Motion are in the best interests of the Debtors' estates, their stakeholders, and all other parties in interest. Accordingly, the Debtors respectfully request that the Court grant this Motion.

### III.  Relief Requested

10.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

> (a)     authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1** and approving the Bid Protections (as

4

defined below) in connection with the sale of substantially all of the Debtors' assets (the "Purchased Assets");

(b)       approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale"), attached as **Exhibit 2** to the Bidding Procedures Order (the "Sale Notice");

(c)       scheduling the Auction and Sale Hearing;

(d)       approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assigned Contracts"); and

(e)       granting related relief.

11.      In addition, the Debtors will seek entry of an order at the conclusion of the Sale Hearing, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"):

(a)       authorizing and approving the Sale of the Purchased Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;

(b)       authorizing and approving the Sale free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

(c)       authorizing the assumption and assignment of the Assigned Contracts; and

(d)       granting any related relief.

12.      The Debtors reserve the right to file and serve before the Sale Hearing any supplemental pleading or declaration that they deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order.

## IV.  Notice

13.      The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Colorado (the "U.S. Trustee"); (b) the administrative agent under the Debtors' prepetition credit facility; (c) all creditors on each Debtor's list of creditors

5

with the 20 largest unsecured claims; (d) the United States Attorney's Office for the District of Wyoming; (e) the Internal Revenue Service; (f) the Environmental Protection Agency; (g) the office of the Attorney General for the State of Wyoming; (h) the Securities and Exchange Commission; (i) counsel to the Stalking Horse Bidder; (j) the United States Bureau of Land Management; (k) the Wyoming Office of Surface Lands and Investments; (l) the Wyoming Department of Environmental Quality; (m) all parties identified as secured creditors in each Debtor's Schedule D filed as required by Section 521(a)(1)(A) of the Bankruptcy Code; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## V.  The Proposed Sale

**A.**     **The Proposed Stalking Horse Purchase Agreement and Contemplated Section 363 Sale.**

14.     The Debtors entered into arm's-length negotiations with the Stalking Horse Bidder to finalize mutual and agreeable terms of the Stalking Horse Bid for the Purchased Assets. The Debtors believe a prompt Sale of the Purchased Assets represents the best alternative available for all stakeholders in these chapter 11 cases. Moreover, it is critical for the Debtors to execute on their proposed Sale transaction within the timeframe contemplated by the Stalking Horse Purchase Agreement and Cash Collateral Motion. Under the Cash Collateral Motion and its Proposed Agreed Interim Order ("Cash Collateral Order"), a sale transaction is to be consummated by December 2, 2016; otherwise, the Debtors will trigger an event of default under the Cash Collateral Order.

15.     The Debtors respectfully request that the Court approve the following general timeline:

- ***Contract Cure Objection Deadline***: 5:00 p.m. (prevailing Mountain Time) ten calendar days from service of the Contract Notice (as defined herein),

6

as the deadline to object to the Cure Amounts listed in the Contract Notice;

- ***Bid Deadline***: 11:59 p.m. (prevailing Mountain Time), on or before October 27, 2016, as the deadline by which bids for the Purchased Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders (as defined in the Bidding Procedures)) must be actually received (the "Bid Deadline");

- ***Auction***: November 2, 2016 at 10:00 a.m. (prevailing Mountain Time), as the date and time the Auction, if needed, will be held at the offices of Lindquist & Vennum LLP, located at 600 17th Street, Suite 1800 South, Denver, Colorado 80202;

- ***Sale Objection Deadline***: 5:00 p.m. (prevailing Mountain Time), on or before seven calendar days after the Bid Deadline, as the deadline to object to the Sale;

- ***Sale Hearing***: on or before November 7, 2016, at 10:00 a.m. (prevailing Mountain Time), or otherwise as the Court's calendar permits, as the date and time for the Sale Hearing.

16. The Debtors believe that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing these chapter 11 estates. To further ensure that the Debtors' proposed Auction and Sale process maximizes value to the benefit of the Debtors' estates, the Debtors will use the time following entry of the Bidding Procedures Order to actively market the Purchased Assets in an attempt to solicit higher or otherwise better bids.

**B.      Material Terms of the Stalking Horse Purchase Agreement.**

17. The following chart summarizes key terms and conditions of the Stalking Horse Purchase Agreement (attached hereto as **Exhibit C**):[1]

---

[1] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall govern in all respects. Capitalized terms used in the following summary have the meanings ascribed to them in the Stalking Horse Purchase Agreement. All references to schedules or sections in the following summary refer to schedules or sections of the Stalking Horse Purchase Agreement.

| Stalking Horse Purchase Agreement Provision | Summary Description |
|---|---|
| Stalking Horse Purchase Agreement Parties (Recitals) | Sellers:  Battalion Resources, LLC, Storm Cat Energy (USA) Operating Co., Storm Cat Energy (Powder River), LLC, and Storm Cat Energy Acquisitions, LLC<br>Purchaser:  Powder Holdings, LLC |
| Purchase Price (Section 2.7(a)) | Purchase Price:  The aggregate consideration for the Purchased Assets (the "Purchase Price") shall consist of:  (i) cash in an amount equal to one Dollar ($1.00) (the "Cash Amount"); plus (ii) the aggregate Cure Amounts required to be paid by Buyer in accordance with the terms hereof to the counterparties of the applicable Assigned Contracts; plus (iii) the assumption of the Assumed Liabilities. |
| Stalking Horse Bid Protections (Section 5.16(c)) | Breakup Fee:  A breakup fee of $500,000 (the "Breakup Fee"), payable in the event of a sale to a higher and better bidder.<br><br>Expense Reimbursement:  Up to $150,000, payable in the event of a sale to a higher and better bidder (the "Expense Reimbursement").<br><br>Minimum Bid:  the aggregate consideration proposed by each Bid must equal or exceed the sum of (i) the Purchase Price set forth in the Stalking Horse Bid, (ii) the Breakup Fee, (iii) the Expense Reimbursement, and (iv) $10,000 (the "Minimum Overbid" and together with the Breakup Fee and the Expense Reimbursement, the "Bid Protections"). |
| Purchased Assets (Section 2.1(a)) | All or substantially all assets of the Debtors. |
| Assumed Liabilities (Section 2.3) | (a) all liabilities and obligations under the Assigned Contracts (including the Cure Amounts), Reclamation Bonds, Reclamation Obligations, Permits, Environmental Claims and Health and Safety Claims, arising after the Effective Date; (b) all liabilities and obligations for Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof following the Effective Date (and for this purpose, any Taxes for any Straddle Period shall be allocated between the portion of such Straddle Period ending on the Effective Date and the portion of such Straddle Period beginning after the Effective Date on an interim "closing of the books method", provided that any Taxes (such as property Taxes) that are not imposed on income, receipts or otherwise on a transactional basis shall be allocated on a daily basis, with "Straddle Period" meaning any taxable period beginning before and ending after the Effective Date); (c) all liabilities and obligations arising after the Effective Date from or relating to any condition of the Purchased Assets or the Business, whether known or unknown or contingent; (c) all post-Effective Date royalties, claim fees, lease payments and any other post-Effective Date payments with respect to the Leases; and Taxes for which Buyer is liable. |

DOCS-#5454658-v1
DOCS-#5454658-V3

| | |
|---|---|
| Assigned Contracts | The Assigned Contracts listed on **Schedule 2.1(d)** of the Stalking Horse Purchase Agreement. |
| Excluded Assets | The Excluded Assets listed in Section 2.4 of the Stalking Horse Purchase Agreement. |
| Excluded Liabilities | The Excluded Liabilities listed in Section 2.2 of the Stalking Horse Purchase Agreement. |
| Representations and Warranties (Art. 3 and 4) | Customary representations and warranties by the Debtors and the Stalking Horse Bidder. |
| Closing and Other Deadlines (Section 7.1(b)(1)) | Drop Dead Date: December 2, 2016. |
| Sale of Avoidance Actions | The Purchased Assets include all Claims, unless specifically described as an Excluded Asset, to the extent related to the Purchased Assets or the Assumed Liabilities, including all Claims arising under chapter 5 of the Bankruptcy Code (i) against counterparties who are party to (or Affiliates of a party to) any Assigned Contract, (ii) otherwise arising under or related to the Purchased Assets, or (iii) against Buyer (or Buyer's Affiliates); provided, that the Debtors retain the right to assert any such Claims as a defense or objection to proofs of claim asserted against the Debtors or the bankruptcy estates in the Chapter 11 Cases. |
| Requested Findings as to Successor Liability (Section 5.16(e)(1) | All of the Assets shall be sold free and clear of all liens, interests, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances). |
| Relief from Bankruptcy Rules 6004(h) and 6006(d) | To maximize the value received for the Assets, the Debtors are seeking to close the transactions contemplated by the Successful Bidder's Purchase Agreement as soon as possible after the Sale Hearing. The Debtors, therefore, have requested a waiver of the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d). |

## VI.  The Bidding Procedures Order

**A.**      **The Bidding Procedures.**

18.      To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached

9

as **Exhibit 1** to the Bidding Procedures Order. The following are the salient points of the Bidding Procedures.[2]

    (a)    **Bid Requirements**. Any bid by an Acceptable Bidder must be submitted in writing and determined by the Debtors, in their reasonable business judgment, to have satisfied the following requirements:

    (i)    *Purchased Assets and Purchase Price*: Each Bid must be a bulk bid to purchase all or substantially all of the Purchased Assets, and must clearly state which liabilities of the Debtors the Acceptable Bidder is agreeing to assume. Each Bid must clearly set forth the Purchase Price to be paid, including and identifying separately any cash and non-cash components.

    (ii)    *Deposit*: Each Bid must be accompanied by a cash deposit in the amount of $650,000, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

    (iii)    *Minimum Bid*: The aggregate cash consideration proposed by each Bid must be equal to, or exceed, the sum of (i) the Purchase Price set forth in the Stalking Horse Bid; (ii) the Breakup Fee and the Expense Reimbursement; plus (iii) the Overbid Increment.

    (iv)    *The Same or Better Terms*: Except as otherwise provided herein, each Bid must, in the Debtors' business judgment, be on terms the same as or better than the terms of the Stalking Horse Purchase Agreement. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include a schedule of Assigned Contracts (pursuant to the Stalking Horse Purchase Agreement) to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price, the Assumed Liabilities, and Purchased Assets to be acquired by such Acceptable Bidder), as well as all other material documents integral to such Bid.

    (v)    *Sources of Financing*: The Bid must indicate the source of cash consideration, including proposed funding commitments and

---

[2] This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order. All capitalized terms used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

confirm that such consideration is not subject to any contingencies. The Bid should include a detailed sources and uses schedule.

(vi) *Tax Structure*: The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if any incremental tax liabilities will be incurred by the Debtors under the Bid.

(b) **Bid Deadline**. Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be actually received by the Debtors, counsel to the Debtors, the Stalking Horse Bidder, and counsel to the Stalking Horse Bidder on or before **October 27, 2016 at 11:59 p.m. (prevailing Mountain Time)** (the "Bid Deadline").

(c) **The Auction**. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid.

(d) **Bidding Increments**. Any Overbid following the initial Minimum Overbid or following any subsequent Prevailing Highest Bid shall be in increments of $10,000.

(e) **Backup Bidder**. Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Purchased Assets, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors (the "Backup Bid").

(f) **Highest or Otherwise Best Bid**. When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate: (i) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Purchased Assets sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; and (v) the tax consequences of such Qualified Bid.

(g) **Reservation of Rights**. The Debtors reserve their rights to modify the Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or

11

prior to the Auction, additional customary terms and conditions on the sale of the Purchased Assets.

19.    Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, do not impair the Debtors' ability to consider all qualified bid proposals, and, as noted, preserve the right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**B.    Form and Manner of Sale Notice.**

20.    On or within three business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) counsel to the Stalking Horse Bidder; (c) counterparties to the Assigned Contracts (the "Contract Counterparties"); (d) all parties who have expressed a written interest in some or all of the Purchased Assets; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Purchased Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) all the Debtors' other creditors; (i) the United States Bureau of Land Management; (j) the Wyoming Office of State Lands and Investments; (k) the Wyoming Department of Environmental Quality; (l) any other governmental agency that is known to the Debtors to be an interested party with respect to the Sale and transactions proposed thereunder; (m) all other parties who are served with notice of this Motion; and (n) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

21.    The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and

place of the Sale Hearing; (d) a reasonably specific identification of the Purchased Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (f) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any).

22.     Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any), the proposed Cure Amounts relating thereto, and the rights, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bidding Procedures Order as **Exhibit 3** (the "Contract Notice") and **Exhibit 4** (the "Assumption Notice") to be sent to the applicable Contract Counterparties.

23.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitute good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rules 2002-1, 6004-1, and 9013-1. The Debtors propose that no other or further notice of the Sale shall be required. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

DOCS-#5454658-v1
DOCS-#5454658-V3

## VII.  Basis for Relief

**A.    The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

24.    A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

25.    The paramount goal in any proposed sale of property of the estate is to maximize proceeds. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

26.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated*

*Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

27.    The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Purchased Assets. The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Purchased Assets and who can demonstrate the ability to close a transaction. Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

28.    At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Entering into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Purchased Assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

29.     The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

**B.      The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

30.     The Debtors are also seeking authority to offer customary bid protections. The Debtors have agreed to pay the Breakup Fee and the Expense Reimbursement to the Stalking Horse Bidder as an allowed administrative expense priority claim. The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (internal citations omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

31.     Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis added). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing

16

some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

32.     As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe that the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Purchased Assets for the benefit of the Debtors' estates.

33.     Here, the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended and will continue to expend significant time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Breakup Fee and the Expense Reimbursement in good faith and at arm's length. As a result, by agreeing to the Bid Protections, the Debtors ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

17

34.     If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtors' estates. Further, if the Bid Protections were to be paid, it will be because the Debtors have received higher or otherwise superior offers for the Purchased Assets. In short, the proposed Breakup Fee is fair and reasonable under the circumstances because it constitutes, at not more than 3.57%, a "fair and reasonable percentage of the proposed purchase price," and the Expense Reimbursement is directly and "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662 (*quoting 995 Fifth Ave.*, 96 B.R. at 28). Accordingly, the Bid Protections should be approved.

**C. The Form and Manner of the Sale Notice Should Be Approved.**

35.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

36.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitute good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**D.     The Assumption Procedures Are Appropriate and Should Be Approved.**

37.     As set forth above, the Sale contemplates the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish a process

18

by which: (a) the Debtors and Contract Counterparties can reconcile Cure Amounts, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such Counterparties can object to the assumption and assignment of the Assigned Contracts and/or related Cure Amounts (the "Assumption Procedures").

38.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Contract Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

39.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

**E.     The Sale Should Be Approved as an Exercise of Sound Business Judgment.**

40.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004).

41.      Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### 1.      A Sound Business Purpose Exists for the Sale.

42.      As set forth above, the Debtors have a sound business justification for selling the Purchased Assets. *First*, the Debtors believe the Sale will maximize the Purchased Assets' going-concern value by allowing a party to bid on assets that would have substantially less value on a stand-alone basis. Moreover, because the Stalking Horse Purchase Agreement contemplates the assumption of certain of the Debtors' estates' Assigned Contracts and environmental obligations, it will result in payment in full for a number of the Debtors' estates' creditors.

43.      *Second*, the sale of the Purchased Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Purchased Assets. Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Purchased Assets and will provide a greater recovery for

their estates than any known or practicably available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

44.     Thus, the Debtors submit that the Successful Bidder's Purchase Agreement will constitute the highest or otherwise best offer for the Purchased Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Purchased Assets through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Purchased Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### 2.     Adequate and Reasonable Notice of the Sale Will Be Provided.

45.     As described above, the Sale Notice: (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Assigned Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

3.    **The Sale and Purchase Price Reflects a Fair Value Transaction.**

46.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

47.    Moreover, as noted above, even as the Debtors move forward with the Sale, they will continue to market the Purchased Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse Purchase Agreement's purchase price will, conclusively, be fair value.

4.    **The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."**

48.    The Debtors request that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets.

49.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease or property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

50.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made. *See, e.g., In re Abbotts Dairies of Pa., Inc.* ("Typically, the

misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud,

collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take

grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d

1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

51.     The Debtors submit that the Stalking Horse Bidder, or any other Successful

Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of

section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement, or any

marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to

the protections of section 363(m) of the Bankruptcy Code.[3] ***First***, as set forth in more detail

---

[3] The Debtors believe that a finding of good faith within the meaning of section 363(m) of the
Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction. Pursuant to the
Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the
Bidding Procedures. In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder

above, the consideration to be received by the Debtors pursuant to the Stalking Horse Purchase Agreement is substantial, fair, and reasonable. *Second*, the parties entered into the Stalking Horse Purchase Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. *Finally*, the Stalking Horse Bidder's offer was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse Purchase Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### 5.     The Sale Should be Approved "Free and Clear" Under Section 363(f).

52.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such

---

(as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

53.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Purchased Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be Assumed Liabilities under the applicable Purchase Agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

54.     The Debtors submit that any interest that will not be an Assumed Liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Purchased Assets to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

DOCS-#5454658-v1
DOCS-#5454658-V3

**F.    The Assumption and Assignment of the Assigned Contracts Should Be Approved.**

**1.    The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment.**

55.    To facilitate and effectuate the sale of the Purchased Assets, the Debtors are seeking authority to assign or transfer the Assigned Contracts to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

56.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

57.    Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment:

26

*First*, the Assigned Contracts are necessary to operate the Purchased Assets and, as such, they are essential to inducing the best offer for the Purchased Assets. *Second*, it is unlikely that any purchaser would want to acquire the Purchased Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. *Third*, the Stalking Horse Purchase Agreement provides that the assumption and assignment of the Assigned Contracts is integral to, and inextricably integrated in, the Sale. *Finally*, the Assigned Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

58.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

### 2. Defaults Under the Assigned Contracts Will Be Cured Through the Sale.

59.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

60.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse Purchase Agreement

requires that the Stalking Horse Bidder cure all defaults associated with, or that are required to properly assume, the Assigned Contracts. *See* Stalking Horse Purchase Agreement §2.3(a). Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### 3.    Non-Debtor Parties Will Be Adequately Assured of Future Performance.

61.    Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

62.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before

designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction. Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Stalking Horse Purchase Agreement.

**G. Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

63.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

64.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other

transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

65.     To maximize the value received for the Purchased Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: September 14, 2016.

**LINDQUIST & VENNUM LLP**

By:     /s/Theodore J. Hartl
        Theodore J. Hartl, #32409
        Harold G. Morris, Jr., #8409
600 17th Street, Suite 1800 South
 Denver, CO, 80202-5441
 Telephone: (303) 573-5900
 Facsimile: (303) 573-1956
Email:  thartl@lindquist.com
Email:  hmorris@lindquist.com

*Counsel for Battalion Resources, LLC*